**CURTIS, MALLET-PREVOST,**
 **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
Steven J. Reisman
Theresa A. Foudy
Myles K. Bartley
Maryann Gallagher

*Conflicts Counsel for the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |
| In re: | : | CHAPTER 11 |
| | : | |
| BALLY TOTAL FITNESS OF | : | Case No. 08-14818 (BRL) |
| GREATER NEW YORK, INC., *et al.*, | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |
| | : | |
| GREAT AMERICAN INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | No. 09-01023 (BRL) |
| BALLY TOTAL FITNESS HOLDING | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

**REPLY TO MEMORANDUM OF GREAT AMERICAN INSURANCE
COMPANY IN OPPOSITION TO BALLY TOTAL FITNESS HOLDING
CORPORATION'S MOTION TO DISMISS THE ADVERSARY COMPLAINT**

Defendant Bally Total Fitness Holding Corporation, a debtor and debtor in

possession ("Bally" or the "Debtor") in the above-captioned jointly administered chapter 11

cases (the "Chapter 11 Cases"), respectfully submits this Reply to the Memorandum of Great American Insurance Company ("GAIC") in Opposition (the "Opposition") to the Debtor's Motion to Dismiss the Adversary Complaint (the "Motion"), and respectfully represents:

## PRELIMINARY STATEMENT

1. Faced with the Debtor's Motion, which indisputably demonstrates that the Interim Fee Agreement[1] does not by its terms create a trust on behalf of GAIC with respect to the $10 million paid by GAIC to Bally years ago, GAIC now hinges its entire case on the notion that an "implied trust" can somehow be discerned from the Interim Fee Agreement. Inexplicably, GAIC further contends that $10 million of the Debtor's current cash reserves are not property of the Debtor's estate under section 541(d) of the Bankruptcy Code, unless and until the Debtor prevails against GAIC in the Rescission Action. These arguments, particularly in the context of a motion to dismiss, cannot sustain GAIC's burden of demonstrating a claim upon which relief may be granted.

2. Surely a sophisticated party like GAIC knew how to create a trust arrangement if that was what was intended. The plain terms of the Interim Fee Agreement come nowhere near it, nor can a trust be implied from its terms. To the contrary, the Interim Fee Agreement was nothing more than a reservation of rights and a non-waiver agreement. Pursuant to the Interim Fee Agreement, GAIC *did not* turn over funds to Bally to be held and returned later. Rather, the Interim Fee Agreement provided that GAIC would reimburse Bally defense costs and that the amount paid to Bally was to be repaid only *if* GAIC brought an action to rescind the insurance policies and *if* GAIC was successful in that action. Because the Interim Fee Agreement *did not* establish that Bally was only temporarily holding funds on GAIC's

---

[1] Unless otherwise indicated, terms that are not herein defined have the meanings ascribed to them in the Motion.

behalf, but rather merely preserved GAIC's ability to later seek repayment of the amount paid to Bally, the Interim Fee Agreement did not create an implied trust.

3. None of the cases relied upon by GAIC hold to the contrary. Indeed, every single one involved a situation in which one party was the undisputed owner of property that the debtor was merely holding on the other party's behalf. The Interim Fee Agreement creates no such situation. The Debtor was not merely holding property on GAIC's behalf. Indeed, there is no logical reason why either GAIC or the Debtor would enter into an arrangement in which GAIC would give the Debtor funds merely to hold on GAIC's behalf. Rather, pursuant to the plain terms of the Interim Fee Agreement, GAIC was fulfilling its contractual insurance obligations to the Debtor.

4. All the Interim Fee Agreement did was preserve GAIC's right to later sue seeking repayment of the amount paid to Bally in accordance with the Interim Fee Agreement and GAIC's contractual obligations. That is not a trust; it is a reservation of rights. GAIC turned the funds over to the Debtor's possession and ownership subject only to a contingent possibility that GAIC might file an action for rescission and might obtain a judgment against Bally in such an action. The Interim Fee Agreement recognizes that, up until such time that GAIC prevails on a rescission claim, the funds belong to the Debtor.

5. A debtor that holds money subject to a contingent litigation claim does not hold that property in trust. If GAIC wanted the funds to be set aside and preserved pending the outcome of a rescission action, GAIC should have either declined to reimburse Bally or demanded that the funds be held in escrow or in a segregated account until the rescission claim could be adjudicated. Having failed to do so, GAIC cannot now attempt to convert a reservation

of rights agreement into a trust agreement and thereby obtain an unfair advantage over all of the Debtor's other unsecured contingent litigation claimants.

6. Accordingly, the Adversary Complaint should be dismissed.

## ARGUMENT

### A. The Interim Fee Agreement Did Not Create An Implied Trust Under Illinois Law

7. The viability of GAIC's Adversary Complaint hinges on its theory that the Interim Fee Agreement created an "implied trust" under Illinois law. (Opp. at 2-4, 10-15, 17-19, 23.) However, even under GAIC's proffered interpretation of Illinois law, such an implied trust would arise only if the Debtor was holding property that indisputably belonged to GAIC subject to a definite obligation to return that property to GAIC. Under the plain terms of the Interim Fee Agreement all GAIC retained was a contingent claim relating to funds that otherwise were being turned over to the Debtor's ownership and possession without condition. Accordingly, no implied trust arose under the law of Illinois (or, for that matter, any other jurisdiction).

8. Under Illinois law, the creation of an express trust requires: (1) intent of the parties to create a trust; (2) a definite subject matter of trust property; (3) ascertainable beneficiaries; (4) a trustee; (5) specifications of a trust purpose and how the trust is to be performed; and (6) delivery of the trust property to the trustee. See Lefelstein v. Donlevy (In re Donlevy), 342 B.R. 774, 781 (Bankr. N.D. Ill. 2006). Illinois courts have noted that where the precise words of a document do not create a trust, but the construction of those words do, the resultant trust is sometimes called an "implied trust," but this type of trust is more properly referred to as an express trust, arising as it does from the affirmative acts of a party evidenced in a written document. See Sears v. First Fed. Sav. & Loan Ass'n of Chicago, 1 Ill. App. 3d 621, 627 (App. Ct. 1971).

9. In determining whether a document creates a trust agreement "what is critical . . . is an intention to create such a relationship." See First Nat'l Bank in Chicago Heights v. Eaton Corp., No. 84-C-3258, 1985 U.S. Dist. LEXIS 16536, at *3 (N.D. Ill. Aug. 23, 1985); see also Eychaner v. Gross, 202 Ill. 2d 228, 254-55 (2002) (intention of parties to create trust is "primary focus" in determining whether trust exists). Further, "[i]t is not enough that the settlor secretly intends to create a trust. No trust will arise unless there is an outward expression of the settlor's intention at the time of the trust's purported creation." Eychaner, 202 Ill. 2d at 254-55. Even where a document uses specific "trust" language, the use of such language is not sufficient to prove the existence of a trust if the agreement otherwise does not evince an intent to create a trust. E.g., LaThrop v. Bell Fed. Sav. & Loan Ass'n, 68 Ill. 2d 375, 381 (1977).

10. In determining whether an agreement intends to create a trust, courts look to whether the agreement calls for the segregation of the funds that were allegedly to be held in trust. See id. at 383-84 (court held advance of funds indicated a debtor-creditor relationship, not a trust). Although, as the Opposition notes, a provision prohibiting the commingling of "trust" funds, or requiring the segregation of such funds, is not absolutely required for the creation of a trust (Opp. at 16), the presence or absence of such a provision is considered a critical factor in determining whether the parties intended to create a trust relationship. See Capitol Indem. Corp. v. U.S., 41 F.3d 320, 324 (7th Cir. 1994) (court held that trust relationship was not created where agreement did not require segregation of funds and payment to alleged beneficiaries out of segregated fund); Chicago Cutter-Karcher v. Maley (In re Lord's, Inc.), 356 F.2d 456, 459 (7th Cir. 1965) (fact that contract did not provide for funds collected to be kept in separate account indicated that trust relationship had not been created despite use of "trust" language); see also Evans Fur Co. of Houston, Inc. v. Chase Manhattan Bank, N.A. (In re Sakowitz, Inc.), 949 F.2d

178, 182 (5th Cir. 1991) (lack of segregation was factor in finding lack of trust relationship even when agreement used term "trust").

11. Applying these principles here, the Interim Fee Agreement did not create an implied trust under Illinois law because it did not manifest an intent to create a trust relationship. Not only does the Interim Fee Agreement not mention the word "trust," there is no mention at all in the Interim Fee Agreement of the manner in which the Debtor was to hold or use the funds reimbursed to it by GAIC. The Interim Fee Agreement did not require the Debtor to keep the funds in suspense or place them in a segregated account. It did not in any way limit the Debtor's use of the funds. All the Interim Fee Agreement did was reserve GAIC's right to sue for rescission and then noted that, *if* GAIC sued for rescission and *if* GAIC prevailed on such a claim, the Debtor would repay the sum advanced – it was a contingent contractual promise rather than the creation of a trust. If GAIC intended that a trust be created, it had the opportunity to make that intention clear in the Interim Fee Agreement, but it did not. Accordingly, under Illinois law, the Interim Fee Agreement did not create a trust.

12. The cases upon which GAIC relies are not to the contrary. Indeed, the Opposition relies on Firestone Tire & Rubber Co. v. Goldblatt Bros., Inc. (In re Goldblatt Bros., Inc.), 33 B.R. 1011, 1013-14 (N.D. Ill. 1983), for the proposition that "when one turns over to another proceeds to be held and later returned," an implied trust is created. (Opp. at 10-12, 16-17.) But, that statement proves the Debtor's point rather than GAIC's. The Interim Fee Agreement did not establish an agreement in which "one turns over to another proceeds to be held and later returned." The Interim Fee Agreement contains no requirement that the funds "be held." Moreover, the Interim Fee Agreement does not require that the funds be later returned; it

only contemplates a contingent possibility that GAIC *might* sue for rescission and *might* prevail on its claim and, *in that event*, the Debtor would be obligated to repay the sum received.

13. In contrast, in Firestone, the parties had a license agreement, under which Firestone sold products under the Goldblatt name and, at the end of each day, Firestone was required to hand over the entirety of the proceeds from that day's sales to Goldblatt, who would then subtract royalty fees and remit the remainder back to Firestone. Firestone had a definite and absolute (rather than contingent) right to receive those funds under the license agreement. See id. In those circumstances, the court held that an implied trust existed. See id.

14. Here, GAIC does not have an absolute right to the return of the $10 million which it advanced to Bally under the terms of the Interim Fee Agreement. The Agreement states: "The Bally Parties agree that *in the event* it is finally established . . . that [GAIC] has no liability under [the insurance policies]," Bally will repay to GAIC the costs of defense advanced under the Agreement. (Adv. Compl., Ex. 3 [Interim Fee Agreement], ¶ 6 [emphasis added].) The Interim Fee Agreement does not create an absolute right for GAIC to have the funds returned (nor does it provide for GAIC to retain any sort of property interest in the funds).

15. Indeed, all the cases relied upon in GAIC's Opposition (Opp. at 14-15) are distinguishable for the same reason. They all involve situations in which one party held money that *indisputably* belonged to another and was required to transfer that money *without qualification or conditions*. See Begier v. I.R.S., 496 U.S. 53 (1990) (employer who withheld taxes from employees to be turned over to government held those funds in trust for government); Marrs-Winn Co. v. Giberson Elec., Inc., 103 F.3d 584 (7th Cir. 1996) (contract specified that separate account would be created for express purpose of paying certain expenses of third

parties); City of Farrell v. Sharon Steel Corp., 41 F.3d 92 (3d Cir. 1994) (employer who withheld taxes from employees to be turned over to government held those funds in trust for government); Universal Bonding Ins. Co. v. Gittens & Sprinkle Enters., Inc., 960 F.2d 366 (3d Cir. 1992) (where New Jersey state law provided that certain funds would be held in trust for benefit of material men and laborers, funds would not become property of debtor's estate); Fed. Ins. Co. v. Fifth Third Bank, 867 F.2d 330 (6th Cir. 1989) (where contract clearly specified that certain payments would be used to pay laborers, debtor held payments in trust for laborers); T & B Scottsdale Contractors, Inc. v. U.S., 866 F.2d 1372 (11th Cir. 1989) (contract specified that separate account was for payment of certain expenses of third parties); Condren v. Harrison (In re LDV Oil, Inc.), 226 B.R. 779 (Bankr. S.D.N.Y. 1998) (at time of bankruptcy filing, third party held equitable title by way of court order establishing its ownership rights to property); Bigelow v. Brown (In re Brown), 168 B.R. 331 (Bankr. N.D. Ill. 1994) (same).

16. In contrast to these cases, GAIC does not have an absolute right to the $10 million that it advanced to Bally. Indeed, the Opposition itself notes that the Interim Fee Agreement's "*raison d'etre* is to dispute Bally's entitlement to the advanced funds," thus conceding the contingent nature of any claim by GAIC to the money. (Opp. at 12.) Under the terms of the Interim Fee Agreement, Bally is obligated to repay GAIC the advanced funds only *if* GAIC brings an action to rescind the insurance policies and *if* GAIC is successful in such an action. Thus, even under GAIC's theory, the money was property of Bally's up until the moment GAIC filed its action for rescission and would become property of Bally's estate again were GAIC to lose its rescission claim. But, what is or is not property of a debtor's estate does not depend on whether a creditor has a contingent litigation claim to those funds. See Mot. at 12 (citing cases); see also Barnhill v. Johnson, 503 U.S. 393, 400-01 (1992) (where debtor delivered

check to creditor 92 days before filing for bankruptcy, but funds were not paid out by bank until 90 days before filing, court held that money was still property of estate until paid out on by bank because receipt of check provided creditor with nothing more than a cause of action to force payment on the check rather than actual concrete right to the money); Capitol Indem. Corp., 41 F.3d at 324 (where agreement setting out terms of subcontracting and contracting agreements did not establish right for subcontractors to be paid out of funds paid to contractors, no trust arose); In re Sakowitz, Inc., 949 F.2d at 182-83 (where claimant could not obtain funds "on demand," no trust was created even though agreement used term "trust"). The Opposition does not cite to a single judicial opinion in which a court found that such a contingent interest was sufficient to create a trust and exempt property from the bankruptcy estate.

17. Ironically, GAIC's Opposition chides the Debtor for purportedly "ignor[ing] the proverbial elephant in the room, and that is the Interim Fee Agreement," and engaging in "strained attempt[s] to avoid the Interim Fee Agreement." (Opp. at 18, 22.) However, rather than ignore the Interim Fee Agreement, the Debtor extensively relies upon it, because its actual terms and language conclusively refute GAIC's claims. (See, e.g., Mot. at 6-8, 10-12.) It is GAIC that ignores the actual language of the Interim Fee Agreement by claiming that it required the funds advanced to Bally be somehow held "in suspense" only to "pass" to Bally should Bally prevail in a future rescission action that GAIC might or might not bring. (Opp. at 6-7.) The Agreement contains no such requirements in form or substance.

18. In addition, in its Opposition, GAIC emphasizes that the funds paid under the Agreement were advanced as reimbursements *after* Bally had incurred and paid out defense costs. (Opp. at 3-4, 19-21.) But GAIC does not explain why it believes that this fact somehow demonstrates the existence of a trust. Regardless of whether the funds were paid to Bally before

or after Bally incurred the defense costs that GAIC was obligated to pay under the insurance contracts, *no limits were placed upon Bally's use of the funds.*

19. Moreover, the fact that GAIC was reimbursing the Debtor for defense costs already paid makes GAIC's trust argument even more puzzling, because a trust requires that the Debtor be holding the money subject to a definite obligation to turn it over to GAIC. Why would GAIC give funds to the Debtor to "hold" on GAIC's behalf for a limited time just to be returned to GAIC? Bally is not a bank or an investment manager.

20. Apparently realizing the illogic of its position, GAIC's opposition contends that the funds paid out were not actually to cover defense costs but were only tied to the amounts paid in defense costs as a way of measuring the amount "in dispute." (Opp. at 7, 19.) But, obviously, the way to measure the amount in dispute was to have Bally review its invoices for legal services and over time maintain an itemized list of amounts paid to defense counsel and in settlement – not to pay the money over to Bally without requiring it to be placed in escrow or segregated in any manner. If the Interim Fee Agreement was intended to provide a mechanism to advance funds, but solely for the purpose of measuring the amount in dispute between the parties, it is odd indeed that there is zero language in the Interim Fee Agreement that states such a purpose. GAIC's interpretation of the Interim Fee Agreement not only contradicts the plain terms of the Agreement, it also defies common sense.

21. In short, under the Interim Fee Agreement, GAIC paid funds to the Debtor with the express intent of reimbursing the Debtor for D&O defense and investigatory costs already paid by Bally, subject only to Bally's promise to repay GAIC *if* GAIC sued for rescission and *if* GAIC obtained a judgment of rescission. The Interim Fee Agreement thus constitutes only

a reservation of rights; not a trust.  The funds GAIC seeks in its Rescission Action cannot be set aside from the Debtor's current cash assets, which clearly are property of the Debtor's estate.

B.  **Bally Has Satisfied Any Burden It Might Have Of Showing That The $10 Million Cash GAIC Seeks Is Property Of The Debtor's Estate**

22. The Opposition contends, without citation, that Bally is required to demonstrate that the Debtor held equitable title to the disputed funds as of the petition date, and that the Debtor has failed to meet that burden.  (Opp. at 14.)  But what GAIC is seeking is $10 million in the Debtor's cash assets from the Debtor's bank accounts.  There is a presumption that such funds constitute the Debtor's property (see Mot. at 9 (citing cases)), and it would be up to GAIC to call that presumption into doubt.  The Opposition and the Interim Fee Agreement fail to rebut this presumption in any respect.

23. A debtor's burden of demonstrating ownership of funds, for the purpose of having such funds included in the bankruptcy estate, is satisfied where the debtor can demonstrate that it had legal title to the account containing the funds and control over the use of the account.  See Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 343 (Bankr. S.D.N.Y. 1999).  Even GAIC admits that the Debtor has legal title to the funds; it is only equitable title that GAIC disputes.  (See, e.g., Opp. at 4-5, 13-15, 17-18, 23.)  Thus, the Debtor has met any burden that it might have, because GAIC has failed to show any basis for questioning whether the $10 million cash it seeks from the Debtor is property of the Debtor's estate.

C.  **The Opposition Fails To Adequately Address The Inequity Of Its Request Or How The Disputed $10 Million Should Be Treated In The Bankruptcy Proceeding**

24. GAIC argues that the Court should not use its equitable powers under section 105(a) to dismiss the Adversary Complaint because, if GAIC is correct that the funds it seeks are not property of the estate, then it is not inequitable to exempt those funds from the

-11-

bankruptcy process. (Opp. at 22-23.) But GAIC fails address the implications of the fact that, *even under GAIC's view*, whether the $10 million is property of the Debtor's estate depends upon the future contingency of GAIC's success or lack thereof in the Rescission Action. The Opposition states that until the question of GAIC's entitlement to repayment is decided the funds should remain in "trust." (Opp. at 21.) However, *even under GAIC's view*, if GAIC loses the Rescission Action, then the $10 million was *always* property of the Debtor's estate and the exemption of that working capital from the estate in the interim while the Rescission Action is litigated will have deprived Bally of valuable cash assets that could have assisted in its reorganization. Thus, it is currently inequitable and contrary to the principles of the Bankruptcy Code to deprive the Debtor of the use of $10 million of its funds just to protect against the future possibility that GAIC might be adjudged to be entitled to rescission. Such action would be highly detrimental to the Debtor's reorganization efforts as the Debtor currently has no DIP financing but rather is operating solely from existing cash assets, cash flow, and working capital.

25. In short, because it is consistent with the provisions of the Bankruptcy Code and in the best interests of the Debtor's estate not to deprive the Debtor of $10 million in needed liquidity just to guard against the possibility that GAIC might prevail in the Rescission Action, the Court should dismiss GAIC's Adversary Complaint pursuant to section 105(a).

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court enter an Order dismissing with prejudice GAIC's Adversary Complaint and granting such other and further relief as is just.

Dated: March 17, 2009
       New York, New York

                                        **CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

                                 By: /s/ Steven J. Reisman
                                      Steven J. Reisman
                                      Theresa A. Foudy
                                      Myles K. Bartley
                                      Maryann Gallagher

                                      101 Park Avenue
                                      New York, New York 10178-0061
                                      Telephone: (212) 696-6000
                                      Facsimile: (212) 697-1559

                                      *Conflicts Counsel for the Debtors
and Debtors in Possession*